**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| TIMBERLAWN MENTAL HEALTH SYSTEM | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. _____ |
| | ) |
| SYLVIA MATHEWS BURWELL, in her official | ) |
| capacity as Secretary, United States Department of | ) |
| Health and Human Services, | ) |
| Defendant. | ) |
| | ) |
| | ) |

---

## VERIFIED COMPLAINT

This is a civil action for injunctive relief, to prohibit the Federal government from shutting down Timberlawn Mental Health System ("Hospital" or "Plaintiff"), a psychiatric hospital that provides critical mental health services to the residents of Dallas and across a seven-county area in north Texas. Plaintiff respectfully requests that the Court maintain the *status quo* by issuing an injunction to restrain the government from the termination and allow the Hospital to continue to operate while it obtains the administrative and judicial review to which it is entitled.

## INTRODUCTION

Plaintiff owns and operates a Texas psychiatric hospital with 144 beds and another unit with 72 beds. The Hospital participates as a provider in Federal healthcare programs, including Medicare, Medicaid, and the Tricare program for active and retired United States service members and their families. The Hospital is, and at all relevant timeframes has been, in compliance with the conditions of participation and other requirements for participating in the Medicare program, and provided high-quality care in a safe environment.

This suit seeks to prevent Defendant Sylvia Mathews Burwell (the "Secretary"), in her official capacity as Secretary of the United States Department of Health and Human Services ("HHS"), from proceeding with termination the Medicare certification of the Hospital prior to an administrative hearing on the merits.

The termination is scheduled for August 7, 2015, following a resurvey performed under the authority of CMS, an agency within HHS, in conjunction with the Texas Department of State Health Services ("DSHS"), conducted June 29 through July 2, 2015 ("July Survey") and a notice letter from CMS to the Hospital dated July 23, 2015 ("Termination Notice" attached as Exhibit A). The Hospital also seeks an order restraining the termination action to preserve the *status quo* pending administrative appeal and to enjoin CMS from its disparate treatment of the Hospital under the System Improvement program.

As will be shown below:  1) the attempted termination is based on arbitrary and capricious actions by CMS;  2) the alleged deficiencies fall far short of the type and severity that would be grounds for termination from the Medicare program, and 3) termination will force the Hospital to close its doors and will cause the residents of Dallas and surrounding seven counties to suffer irreparable harm.

The vast majority – nearly eighty percent -- of all patients treated at the Hospital are beneficiaries of Federal health care programs and their contracted managed care providers, including Medicare, Medicaid and Tricare.  These beneficiaries include individuals in the Nation's military and their families.  Contracts with government payers, as well as with private third party payers whose terms generally require Medicare certification, will be terminated if the Hospital is terminated from Medicare.  With this combined impact, the Hospital will be forced to

close its doors – devastating for patients, Hospital employees and communities across seven north Texas counties.

The Hospital's patients, many with severe psychological problems, will be harmed, and the communities will not be able to assure adequate care for these individuals. The majority of patients the Hospital serves are chronically ill Medicaid, underfunded, and unfunded patients. Termination of the Hospital will cut off access to necessary emergency psychiatric services, including individuals brought to the Hospital by law enforcement and others under Texas detention and commitment laws, for mental health evaluation and admission.

These communities simply cannot recover from the loss of the Hospital in any acceptable timeframe without suffering substantial, irreparable harm. Access to mental health services is a serious public health concern. The Hospital provides services that are vital to the continued functioning of the entire area's mental health delivery system.

This lawsuit is necessary because administrative law judges have no authority to issue an injunction restraining termination and they lack the power to maintain the requested *status quo* pending appeal. As CMS cannot dispute, the Medicare administrative review system is overburdened and understaffed. It can take many months to process an appeal through the first level; further, the review is post termination. By then it will be too late. If the Medicare termination action is allowed to proceed, the Hospital will be forced to close, an action that will cause significant irreparable harm. At a minimum, as pleaded herein, thousands of patients will not be able to receive necessary emergency, inpatient and outpatient treatment from their healthcare providers at the Hospital; access and continuity of care that is so vital in mental health care field will be destroyed; hundreds of Hospital employees will lose their jobs; and law

enforcement and others who depend on a high-functioning behavioral health delivery system will be severely impacted.

If, on the other hand, the Hospital is not forced out of business as a result of this termination action by CMS, it will be able to show during the process for an administrative hearing and subsequent judicial review that:

a)      the purported deficiencies cited by the Secretary's agents do not constitute grounds for terminating the Hospital from the Medicare program;

b)      at the time of the survey, the Hospital was and continues to be, in substantial compliance with all Medicare requirements;

c)      the Hospital has corrected any alleged problems upon which the termination action could have been potentially based; and

d)      the termination action is based on erroneous factual findings and conclusions and therefore invalid.

The Hospital has no adequate remedy at law, and seeks only to preserve the *status quo* pending the administrative hearing and any ultimate judicial review of the results of that hearing. If injunctive relief is not granted, the Hospital will be forced to close.  Given the inherent delay in the administrative process, this will foreclose any judicial review of the Secretary's actions.

The Hospital does not now seek from this Court a determination on the merits as to whether the Hospital should be terminated from the Medicare program, but only an injunction to prevent irreparable harm to the Hospital and its employees, the patients and their families, the affected communities, and others who depend on the mental health delivery system, pending completion of the administrative review process and until judicial review on the merits is ultimately available to the Hospital.

To obtain administrative review, the Hospital has submitted a Request for Expedited Hearing with the Civil Remedies Division, United States Department of Health and Human Services Departmental Appeals Board. The Hospital has serious arguments on the merits on which it is substantially likely to prevail – arguments that deserve to be heard during an administrative hearing and, if necessary, on subsequent judicial review.

## THE PARTIES

1.     Plaintiff, a corporation organized and in good standing under the laws of Texas, owns and operates the Hospital. The events leading up to the Secretary's decision to terminate the Hospital from the Medicare program took place at its facility in Dallas, Texas. The Hospital is accredited by The Joint Commission, and participates in the Medicare program pursuant to a provider agreement with the CMS and applicable federal statutes and regulations. The Hospital has never been terminated from these programs.

2.     Defendant Sylvia Mathews Burwell, named in her official capacity as the Secretary of HHS, an agency of the United States Government, is responsible for administering the Medicare program. CMS is the operating component of HHS charged with the administration of Medicare.

## JURISDICTION AND VENUE

3.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, because the case arises under the Federal laws and the Due Process Clause of the United States Constitution; and under the Court's equity powers and inherent power to preserve its own jurisdiction under 28 U.S.C. § 1651. Exhaustion of administrative remedies is not required prior to issuing the injunction where, as here, exhaustion would mean no review at all and equate to the practical equivalent of a total denial of judicial review. The Court further has the authority to issue relief in this case pursuant to the Administrative Procedure Act 5 U.S.C. § 551 *et seq.*, including

5 U.S.C. §§ 705 and 706(1) and (2); pursuant to 28 U.S.C. § 1651, the All Writs Act; under 28 U.S.C. § 1361, mandamus to compel an officer or employee of the United States or Federal agency to perform a duty owed; and under 42 U.S.C. § 1395, the prohibition against Federal interference with entities providing health care services.

4.      Venue in this district is proper under 28 U.S.C. § 1391(c) and (e) and 5 U.S.C. § 703, because the Hospital resides in the Northern District of Texas.

## FACTS

5.      Hospitals participating in Medicare are required to meet certain requirements, referred to as "Conditions of Participation." 42 U.S.C. § 1395x(e); 42 C.F.R. Part 482.  Psychiatric hospitals are required to meet the general Conditions of Participation applicable to acute care hospitals at 42 C.F.R. §§ 482.1-.57, as well as two additional requirements related to medical records and staffing.  *See* 42 C.F.R. §§ 482.1 - 482.57; 482.60-.62.   The general hospital requirements are also referred to as "A-tags" and the two additional psychiatric hospital requirements are termed "B-tags."

6.      The Medicare program does not itself ordinarily conduct routine, periodic surveys to determine whether a hospital meets the applicable Conditions of Participation.   Instead, a hospital is "deemed" to meet the A-Tag and B-Tag Conditions of Participation for Medicare if it is accredited by a CMS-designated organization such as The Joint Commission.  At all times during this process, Timberlawn has retained its accreditation by The Joint Commission.

7.      Compliance with the Conditions of Participation is monitored by CMS through on-site surveys, usually conducted by state agency personnel acting as agents of CMS.  *See* 42 U.S.C. § 1395aa (providing for delegation of survey functions); 42 C.F.R. §§ 488.10-488.11. DSHS is the authorized state agency that surveys hospitals and other types of providers on behalf of CMS in

Texas.  Hospital surveys for the two additional psychiatric hospital requirements are typically carried out by CMS surveyors unless the state survey agency has the expertise to serve on the team.   CMS State Operations Manual (CMS Pub. 100-07) ("State Operations Manual"), Appendix A.

8.    If CMS receives information about a hospital that raises a substantial allegation of noncompliance with a Condition of Participation, CMS can authorize a complaint survey by DSHS at the hospital.  DSHS focuses primarily on the areas related to the allegations and reports their recommendations back to CMS.  If CMS determines that the hospital is out of compliance with one or more Condition of Participation it can initiate a Medicare termination.

9.    A provider agreement will not be terminated, however, if existing deficiencies, noted either individually or in combination, neither (a) *jeopardize the health and safety of patients nor (b) are of such character as to substantially limit the provider's capacity to render adequate care*.  42 C.F.R. § 488.28(b).

10.    During a Medicare termination action, its "deemed" status is lost and survey jurisdiction shifts to CMS.   After a hospital is determined to be back in compliance with the hospital Conditions of Participation, its "deemed" status is restored and survey jurisdiction shifts back to the accrediting organization, in this case The Joint Commission.

11.    CMS has issued procedures for surveyors to follow when conducting surveys to determine whether a hospital is in substantial compliance with the Conditions of Participation.   These procedures are contained in the CMS State Operations Manual ("SOM") (CMS Pub. 100-07). Surveyors must detail cited deficiencies on a prescribed form, the CMS-2567 statement of deficiencies, which they submit to CMS.  *See generally* SOM §§ 2713-15, 2720-22.  The DSHS

surveyors make recommendations, but only CMS can make the decision to terminate a hospital from Medicare. *See* SOM §§ 2200E, 2728B, 3012.

12.    Unfortunately, these survey procedures are not specific, nor are the standards under which providers are measured, resulting in a highly discretionary process which can – and does, as here – result in arbitrary and capricious determinations and outcomes that can be tempered in some cases when CMS agrees to extend the termination date in certain cases,  thereby allowing increased government oversight during a defined period of time.  The alternative is a protracted appeal.  To date, CMS has refused to allow the Hospital to participate in this process.

13.    Deficiencies found during surveys are of three types "Element" and "Standard" level violations, which do not result in a termination action; or "Condition" level violations, in which the hospital is placed on a "track" to be terminated from the Medicare program.  Normally, if a violation rising to a "Condition" level is found, a hospital is given ninety days to correct the deficiency before termination becomes effective.  CMS *State Operations Manual* § 3012.

14.    If there is a "Condition" level violation, and it is also determined that such violation results in a crisis situation where there exists an "Immediate Jeopardy" to patient health and safety, the hospital is placed on a 23-day "fast track" for termination.  *Id.* at § 3010. Immediate Jeopardy is defined as a crisis situation where the provider's noncompliance with one or more requirements of participation *has caused, or is likely to cause, serious injury, harm, impairment, or death*.  42 C.F.R. § 489.3 (2009).  *See* CMS State Operations Manual, Appendix Q – Guidelines for Determining Immediate Jeopardy, §§ II (2014).  Potential harm is not sufficient for a finding  - the measure is likely and serious injury, harm, impairment or death  -- the *"high potential* for these outcomes to occur *in the very near future.  See id.* at § III  (p 3) (emphasis added).

15.    When an Immediate Jeopardy no longer exists, the hospital is taken off the 23-day termination track and, if still out of compliance with any of the Conditions of Participation, either placed back on the 90-day track or CMS may restart the track.

16.    In determining whether a situation constitutes Immediate Jeopardy or whether the Immediate Jeopardy has been removed, the surveyors consider, among other factors, the immediacy of the situation. *See id.* at §§ IV and V.  When a potential Immediate Jeopardy is identified by a survey team, the Team Leader is required to contact the DSHS while the team is onsite. *See id.* at § V (C).

17.    If an Immediate Jeopardy situation is identified, the surveyors are required to tell the administration of the hospital, so the hospital is able to immediately address the situation. Written notice of the Immediate Jeopardy must be provided to the Hospital within two days after the survey is completed. *See id.* at § VI. ("The notice describing the Immediate Jeopardy must be delivered to the entity no later than 2 days (refer to specific SOM reference) of the end of the survey. If official notification of **all** deficiencies, i.e., Form CMS-2567, was not given on the second day, a completed Form CMS-2567 must be sent to the entity on the tenth working day.")

18.    CMS and the DSHS surveyors acting on its behalf must also follow specific notice requirements prior to terminating a provider.  Federal Regulations require a notice be given to the provider at least fifteen days prior to the effective date of termination, which sets forth "the reasons for, and the effective date of, the termination, and explains the extent to which services may continue after that date . . . ."  CMS must concurrently give notice to the public. The *State Operations Manual* procedures mirror this requirement in Section 3012.1 (official termination notice to be sent to hospital on the seventieth calendar day in a ninety-day termination action, followed by publication of public notice).

19.     When a hospital is terminated from the Federal Medicare program, that hospital will be terminated from participating in the state-run Medicaid program as well.    42 U.S.C. § 1395cc(c)(2) (providing for Medicare notification to Medicaid of the Medicare exclusion); 42 U.S.C. § 1396a(p)(1) (providing for termination from Medicaid for any reason serving as the basis for termination from Medicare).  Payments from other governmental payers and most other private third party payors will also be lost when a hospital is terminated from Medicare according to contract terms.

20.     Neither the 90-day nor the 23-day Immediate Jeopardy track for termination provides for a pre-termination hearing.  Instead, standing to request an administrative hearing is available to a hospital only after the termination has gone into effect.  The current process for obtaining a hearing and final agency action – even when expedited relief is sought – will take many months. *See* 42 U.S.C. § 1395cc(h)(1) and 42 C.F.R. § 498.5.  The Hospital will not be able to seek judicial review of any final administrative decision regarding its termination until long after it is forced to close its doors.  Such review is tantamount no review at all.

### The Hospital

21.     Timberlawn Mental Health opened in 1917 and, for nearly 100 years, the Hospital has been an integral part of the mental health service delivery system in north Texas.  In 2006, the Hospital responded to community need by expanding the number of licensed beds on the main campus from 124 to 144, and this year the Hospital continued that effort by adding a 72-bed unit in Garland.

22.     The Hospital provides high quality mental health services.  At all times during this process Timberlawn has been accredited by The Joint Commission.  It has outperformed the State of Texas and national rates on all Inpatient Psychiatric Facility Quality Reporting (IPQR) measures

since the inception of the required CMS reporting for psychiatric facilities. In 2013 and 2014, the Hospital was recognized by The Joint Commission as a Top Performer in Key Quality Measures.

23.    The Hospital provides vital emergency psychiatric services, as well as inpatient services, including child and adolescent, adult psychiatric, adult intensive care, trauma, geropsychiatry, and dual diagnosis (psychiatric disorders and substance abuse). The Hospital also provides outpatient services; among these are intensive outpatient programs for chemical dependency, outpatient clinic services, and Partial Hospitalization Programs (PHP) in four areas: adult psychiatric, adult intensive care, trauma and adolescent.

24.    The Hospital's vital place in Dallas and the north Texas community is evidenced in part by the number of individuals being provided treatment, with a combined total outpatient and inpatient admissions of 12,623 in 2014.

25.    If the Hospital closes, the market does not have the capacity to absorb the expected admissions. Even taking into account available beds at other facilities, there are factors that restrict the number of patients served at any one hospital despite the existence of "open beds." For example, hospitals often lack adequate numbers of psychiatrists, nurses, and clinicians to care for patients at licensed capacity. Additionally, the mix of patient age, gender, and condition impact whether a hospital can admit an inpatient to an open bed. Children and adolescents by Texas rule may not be housed in the same units with adults. Many hospitals also separate child/adolescent populations so that males and females have distinct units. The majority of patient rooms in psychiatric hospitals are double-occupancy. It is therapeutically important, however, for some patients to room alone. Finally, a hospital's current situation may be such that not every admission would be appropriate.

26.     The Hospital is located on a campus with eight distinct units.  This enables the Hospital to

provide appropriate separation of patients by gender, acuity, age, and clinical presentation.

Treating a high volume of chronic patients in one location promotes efficiency and facilitates

collaboration with key mental health service providers.

27.     The Hospital provides unique and critical services to area children and adolescents as well

as the adult population including, among others:

   a)  NorthSTAR:

        NorthSTAR is a publicly funded program that provides behavioral health services to

medically indigent patients and most of the Medicaid beneficiaries in a seven-county region

(Collin, Dallas, Ellis, Hunt, Kaufman, Navarro, and Rockwall).  These counties pool their

financial resources for treating indigent patients with Medicaid funding to collectively fund the

NorthSTAR program.  Four of these counties have *no inpatient psychiatric beds*.  NorthSTAR

contracts with the following five hospitals to provide inpatient psychiatric services to all

NorthSTAR members.  The Hospital is a significant provider in the NorthSTAR network.*

| Hospital | Child/Adolescent Beds | Adult Beds |
|---|---|---|
| *Timberlawn | 34 | 110 |
| Green Oaks | 8 | 116 |
| Hickory Trail | 22 | 64 |
| Parkland | 0 | 18 |
| Glen Oaks | 16 | 38 |
| Medical Center McKinney, Wysong | 0 | 60 |

        In order to treat this underserved population, NorthSTAR has designated two facilities to

be the primary treatment facilities in the region.  The Hospital is the designated primary facility

for children and adolescents.  Since January 2014, Timberlawn has admitted 1,783

child/adolescent NorthSTAR members.  With this high volume of service to children and

adolescents, Timberlawn has a significant number of child/adolescent psychiatrists, social

workers, and nursing staff dedicated to serving youth exclusively.  Green Oaks is the designated primary facility for adults, and Timberlawn serves as the overflow facility for adults when Green Oaks reaches capacity.  Timberlawn also admits NorthSTAR adults referred from other sources. Since January 2014, Timberlawn has admitted 2,141 NorthSTAR adults.  NorthSTAR does not transfer any of its members to facilities outside the seven-county area.

No other provider in this seven-county area is equipped to address the critical treatment needs of this vulnerable population if the Hospital closes.

b) <u>APOWW</u>:

Since 2008, the Hospital has been designated by the North Texas Behavioral Health Authority to be a receiving site for individuals detained by a peace officer on an Apprehension by a Peace Officer Without a Warrant (APOWW) because the individuals appeared to pose a threat to themselves or others.  It is the primary designated receiving site -- the 'front-door' -- for all individuals under the age of eighteen detained under an APOWW.  Peace officers bring children and adolescents to the Hospital to be assessed for possible admission or referral to appropriate outpatient services.  Timberlawn is unique in providing a centralized location, expertise with this population, and the physical space and personnel to conduct the assessments.

The impact to the affected communities is substantial.  Since early 2014, Timberlawn has provided 2,883 evaluations and assessments under the APOWW program.  Based on year-to-date data, the number of patients is increasing substantially.  The other psychiatric providers in the Dallas area cannot absorb this volume of assessments and admissions if the Hospital closes.

c. <u>1115 DSRIP Waiver Project and Magnolia Partial Hospitalization Program</u>

In 2014, the Hospital was awarded an 1115 Waiver project to provide partial hospitalization services to adolescent and adult medically indigent recipients who are high

utilizers of services.  The goal of the program is to treat these patients effectively in an outpatient setting and to reduce costly and preventable inpatient admissions.  Under this program, under which the Hospital partners with Metrocare:

- The 6-hour per day program provides group therapy 5 days a week, psychiatric visits, nursing visits, and transportation.

- Since the program's inception in 2014, Timberlawn has served 375 individuals.

- The program has successfully decreased the readmission rate by 27% for this population.

- Of the 131 DSRIP projects in the region, Timberlawn has the only project offering this unique level of care to one of our most acute and recidivistic populations.

If Timberlawn no longer provides services in the community, this successful program would be discontinued because the funding is tied directly to Timberlawn, resulting in Metrocare losing approximately $600,000 annually.

28.     The Hospital treats individuals requiring care regardless of their ability to pay.  In 2014, uncompensated care provided to needy individuals by the Hospital totalled nearly $4 million. This number is increasing.  Year to date in 2015, the Hospital has provided $2,860,890 in uncompensated care.

29.     Nearly eighty percent of all patients treated at the Hospital are Federal healthcare program beneficiaries, including those with Medicare and Medicaid and contracted out to managed care providers.  Nearly all of the remaining third-party payors require Medicare participation as well. Therefore, termination from the Medicare and Medicaid programs will close the Hospital, a devastating result for the Hospital's patients and their families, hundreds of Hospital employees,

community businesses, as well as law enforcement and others who depend on a functioning behavioral health delivery system.

30.     Without the requested restraining order, this vital and necessary component of the behavioral health system in north Texas will be lost.

31.     The mentally ill population in the greater Dallas area is highly acute and recidivistic.  The Hospital works with other community providers to improve and maintain the behavioral health service delivery system for these patients.   Key collaborations and programs include, for example:

    a.   Metrocare Family Preservation Program (FPP)

Upon admission to the Hospital, FPP engages with children and adolescents who are at risk for readmission by providing specialized services for the family, to reduce the future utilization of acute services.

    b.   ADAPT of Texas

Timberlawn and ADAPT, a disability rights group, work together to provide patients that do not require inpatient admission with immediate access to crisis services in the community, scheduling appointments and arranging for transportation to enable the patient to follow through with the treatment recommendation.  Organizations like Metrocare and ADAPT have limited resources and are not positioned to serve multiple sites with these services.  If Timberlawn closes, the fragmentation and loss of connectivity to community resources for further care will have an immediate negative impact on patients' recidivism.

    c.   The Ross Institute for Trauma

The Hospital's trauma program is a nationally recognized program treating highly acute patients with unresolved trauma and attachment issues who have struggled to maintain stability

despite prior hospitalizations.  The Ross Institute is present in only three inpatient psychiatric hospitals in the country, with Timberlawn being the first. In 2014, there were 518 admissions to the Trauma program.

32.    The Hospital provides unique programs and services to the community that would be lost if it were to close including, among others:

a.   Since 2009 Hospital has provided monthly training alongside the Dallas Police Department for peace officers in the Memphis Crisis Intervention Team (CIT) model.  In addition to direct training, Hospital provides monthly on-campus tours to peace officers to help further their understanding of individuals with mental health problems.

b.   The Hospital works with the North Texas Behavioral Health Authority to assist in the planning and delivery of the continual evolution and improvement of the mental health delivery system in north Texas.

c.   The Hospital works with the Region 10 Education Service Center to provide video-conference training for counselors in eighty school districts across the north Texas region.

d.   The Hospital provides onsite training for:

   • Medical students from Texas A&M

   • Psychology and Social Work interns from: Texas Woman's University, Southern Methodist University, The University of North Texas, The University of Texas at Dallas, University of Texas at Tyler, Amberton University, Dallas Baptist University, LeTourneau University and Capella University

   • Nursing Students from Texas Woman's University and the Baylor School of Nursing

   • Dietetic Interns from Baylor University Medical Center

   • Therapeutic Recreation students from Oklahoma State University

33.     Medicare termination and closure of the Hospital would have other substantial negative effects on the local communities as well.  The Hospital is a major employer in metropolitan Dallas.  The Hospital has over 315 employees and a medical staff of twenty psychiatrists and internal medicine practitioners.  CMS' actions would cause those employees to lose their jobs, adding substantial financial burdens and other stress to their families.

34.     In 2014, the Hospital purchased over $4 million in services from the local community for its operations.  These services included the overall management and maintenance of the building and grounds, utilities, supplies, and other products and services.

### The Surveys

35.     DSHS conducted a survey after receiving a self-report from the Hospital of a patient death (the "Initial Survey"), from February 17 through 25, 2015.  The Initial Survey, conducted by state DSHS surveyors on behalf of CMS, resulted in a finding of Immediate Jeopardy and the alleged noncompliance with two Conditions of Participation – Patient Rights at 42 CFR 482.13, and Quality Assessment and Performance Improvement (QAPI) at 42 CFR 482.21.  Accordingly, the Hospital lost its "deemed" accreditation status, and jurisdiction shifted from The Joint Commission to CMS.  The Hospital was placed on a 23-day track for termination from Medicare.

36.     Within days of receiving the CMS Statement of Deficiencies ("SOD"), the Hospital provided a Plan of Correction and a request for reconsideration concerning the Immediate Jeopardy finding.  During that timeframe, beginning March 20, 2015, DSHS conducted an unannounced focused survey following a complaint, but no deficiencies were cited and the complaint was found to be unsubstantiated.

37.    On March 25, 2015, the surveyors returned and informed the Hospital that the Immediate Jeopardy had been removed, which meant that CMS had confirmed existing conditions at the Hospital did not jeopardize the health and safety of patients.  CMS confirmed this in writing on April 30, 2015.  Accordingly, the Hospital was not terminated from Medicare at that time and instead was placed on a track for termination effective June 1, 2015.

38.    On March 31, 2015, one portion of the required resurvey for compliance with the Conditions of Participation was initiated, the Life Safety Code survey.  Several weeks later, the remainder of the resurvey was conducted on the A-tag and B-tag Conditions of Participation, from April 20 to May 1, 2015.  Additional focused surveys were performed May 1 and May 12-13, 2015.

39.    CMS subsequently issued a Statement of Deficiencies on May 29, 2015, alleging the Hospital was out of compliance with several Conditions of Participation based on the results from certain of these surveys, and setting a termination date of July 13, 2015.

40.    The Hospital timely submitted a Plan of Correction on June 8, 2015, which DSHS initially rejected.  In a letter dated June 9, 2015, DSHS asked the Hospital to provide additional details by 5 p.m. the following day, and also made an unusual request -- that the Hospital revise the document to put verbs in the "present tense."  When the Hospital questioned their insistence on altering the tense describing the actions the Hospital had already taken (which would result in incorrectly re-couching past actions as presently occurring, making it look like the Hospital had delayed its corrective actions), DSHS did not press on its grammar correction and instead accepted the expanded Plan of Correction submitted by the Hospital on June 10, 2015.  This meant that although the Hospital was on a track for termination, it would be resurveyed to confirm compliance.

41.     A resurvey was conducted June 29 through July 2, 2015.  Twenty days after the resurvey , DSHS informed the Hospital in a phone call that it was identifying an Immediate Jeopardy.  The next day, three weeks after the resurvey, CMS issued a notice of termination (Exhibit A) effective August 7, 2015, finding an Immediate Jeopardy and non-compliance with two Conditions of Participation.

42.     It is this termination notice that the Hospital has appealed with the Administrative Law Judge and it is from this notice that the Hospital seeks this Court to grant a temporary restraining order pending the administrative appeal process and, if necessary, subsequent judicial review.

43.     The Hospital cooperated fully with the surveys and took immediate steps to address the concerns expressed by the surveyors during and after the surveys.  The Hospital performed extensive, timely actions to correct -- and has corrected -- all alleged deficiencies.

44.     At no time was the Hospital out of compliance with any of the Conditions of Participation.

45.     At no time was there any crisis situation that would support a finding that an "Immediate Jeopardy" to patient health and safety existed.  This is supported by CMS' actions, which contradict CMS' own conclusion.  The evaluation of whether an Immediate Jeopardy situation existed needed to occur while the survey team was on site.  If an Immediate Jeopardy situation was identified through the process described in the SOM Appendix Q, a verbal notice should have been given with the specific details, including the individuals at risk, before the survey team left the premises.  This notice allows the applicable entity to begin immediate removal of the risk to individuals and immediately implement corrective measures to prevent the jeopardy identified.

46.     If an Immediate Jeopardy really existed, it was incumbent on CMS to inform the Hospital immediately in order to prevent ongoing harm (if any).  The State Operations Manual requires

that written notice of the conditions creating the purported Immediate Jeopardy to the Hospital be provided *within two days of the end of the survey*. CMS State Operations Manual, Appendix Q, p. 18 (2014). In fact, the SOM requires that the surveyors notify the hospital's administration of the Immediate Jeopardy, including the individuals who are at risk, *before the survey team leaves the premises*. *Id.* This allows the applicable hospital to begin "immediate removal of the risk to individuals, and immediately implement corrective measures to prevent repeat Jeopardy situations." *Id.*

47.     Here, the process was not followed. The first oral notice the facility received was on or about July 22, 2015. The notice letter dated the next day arrived three weeks after the resurvey – this was the first written notice given to the Hospital of their purported Immediate Jeopardy finding. In the letter, CMS claimed that patients were at risk to their health and safety, and that the Hospital's participation in the Medicare program would be terminated effective August 7, 2015. Three weeks is a significant gap compared with the timeframes in the CMS State Operations Manual.

48.     This time gap belies the validity of the Immediate Jeopardy claim. In addition, the Statement of Deficiencies from the resurvey contains factual inaccuracies in support of the purported Condition-level violations. Moreover, the alleged deficiencies do not rise to the level of failing to substantially comply with the Medicare requirements. Taken together, this invalidates the attempted termination action.

49.     Attached as Exhibits B and C are charts outlining the deficiencies alleged by CMS in the Statement of Deficiencies (first column of each exhibit) and the Hospital's response (second column), documenting why each of the allegations do not rise to a Condition-level violation or

comprise an Immediate Jeopardy. These arguments were included in the Request for Expedited Hearing filed with the HHS Departmental Appeals Board.

## VIOLATIONS OF DUE PROCESS AND THE ADMINISTRATIVE PROCEDURE ACT

50.    The survey process is highly subjective and lacks adequate guidance for state surveyors and CMS regulators, leading to gross variation and inconsistently applied standards. Here, the decision to terminate the Hospital on August 7, 2015, was arbitrary and capricious. The Hospital is, and has been over the relevant time period, in compliance with all of the Medicare Conditions of Participation. The deficiencies cited by CMS in support of its decision to terminate the Hospital are not sufficient for a finding that the Hospital was out of compliance with the Conditions of Participation or that a crisis situation existed where noncompliance has caused, or is likely to cause, serious injury, harm, impairment, or death.

51.    The fate of a vital and necessary component of the community's mental health system is at stake. With the current administrative process, unless CMS extends the deadline or an injunction issues, ultimate redress lies years away, long after the Hospital will have closed. As applied, the process forecloses the opportunity for judicial review. Furthermore, the remedy of termination is not legally justified in light of the substantial compliance of the Hospital with all Conditions of Participation, which constitutes additional, independent grounds for invalidating the termination action. Notwithstanding its position that there have been no Condition-level violations, the Hospital performed extensive, timely corrective actions in response to each of the CMS surveys.

52.    Despite this, CMS has continued to move towards termination on August 7, 2015. The decision to terminate the Hospital's provider agreement under Medicare and the process by which this termination is being effectuated is arbitrary, capricious, contrary to law, and unsupported by the evidence.

53.     Prior to filing this lawsuit, the Hospital requested an expedited hearing before an Administrative Law Judge in the Civil Remedies Division of the U.S. Health and Human Services Departmental Appeals Board, seeking administrative of the termination determination. Judicial review is not expected, however, before the Hospital will be forced to close as a result of CMS' actions.

54.     The Hospital also states a collateral claim for injunctive relief that arises out of the arbitrary and disparate manner in which CMS has conducted the termination process as it relates to Timberlawn.

55.     CMS has violated 5 U.S.C. § 706(1), because the current process for obtaining a hearing and final agency action – even when expedited relief is sought – will take many months. *See* 42 U.S.C. § 1395cc(h)(1) and 42 C.F.R. § 498.5. This post-termination process comprises an unreasonable delay as applied in this case, the length of which will force the Hospital to close its doors. Further, certain requirements CMS is imposing on the Hospital are neither required by law or standard of care, in violation of 42 U.S.C. § 1395. (see <u>Exhibits B and C</u>).

## **IRREPARABLE HARM TO HOSPITAL AND OTHERS**

56.     If Defendant is not restrained pending administrative hearing or, alternatively, if CMS does not agree to extend the deadline for termination, then termination of the Hospital from the Medicare program will ensue, causing great and irreparable harm to the Hospital, to its patients and employees, their families, and to the communities the Hospital serves across north Texas.

57.     Termination will lead to Hospital closure and create a sizable gap in the region's mental health care delivery system that will be impossible to fill in any timely manner, thereby creating a significant risk to the public health and welfare. At the present time, nearly eighty percent of the Hospital's services are provided to beneficiaries of Federal healthcare programs, including

Medicare, Medicaid and Tricare programs and their contractors, which would be lost if the Hospital were to be terminated from Medicare. In addition, nearly every other third-party payer, particularly managed care plans, do not permit their patients to be hospitalized in a facility that is not Medicare-certified. The Hospital relies almost exclusively on revenue from Medicare, Medicaid, TRICARE and other third-party payers. Accordingly, if the Hospital were to lose its Medicare certification, the Hospital would lose virtually all of its revenue and would be forced to close.

58.    As described in the introductory section of this Verified Complaint, the Hospital provides necessary emergency, acute inpatient and outpatient behavioral health services, including trauma, child and adolescent, adult, geropsychiatry, dual diagnosis, intensive outpatient programs for chemical dependency, Partial Hospitalization Programs (PHP), and outpatient clinic services. The Hospital serves as the designated facility for children and adolescents apprehended by a peace officer without a warrant to be evaluated and treated, for seven Texas counties. Since early 2014, Timberlawn has provided 2,883 evaluations and assessments under the APOWW program.

59.    Closure of the Hospital would dramatically increase the pressure on a community already straining to meet the needs of patients in the region. Closure would create delays and other barriers to access, effectively rendering these services unavailable to patients in the region and precluding many seriously ill patients from access to necessary treatment.

60.    In addition, the transfer of patients and the inability of the Hospital to provide services would be harmful as well. Continuity of treatment is important, particularly with behavioral health. Patients establish relationships with nurses, therapists, staff, physicians, and others that

are essential to their therapy and recovery.  Disruption of these relationships would clearly cause harm that could not be repaired.

61.     The Hospital has treated thousands of patients during its nearly 100-year history.  Last year, the outpatient and inpatient admissions totalled 12,623.  The Hospital also has provided millions of dollars annually in uncompensated care to individuals who are not able to pay for their healthcare.

62.     As described above, the Hospital has been actively involved with numerous organizations, working to improve and maintain the regionals behavioral health delivery system.  Closure of the Hospital would have a negative impact on the community by eliminating these valuable community partnerships.

63.     Attached in Exhibit D are letters received in support of the Hospital  The Hospital has built a reputation in Dallas and north Texas as a provider of high quality health care, and the Hospital's reputation would be unjustifiably harmed by the Secretary's unwarranted termination of its Medicare provider agreement.

64.     Medicare termination and closure of the Hospital also would have substantial negative effects on the local economy, including state and local tax revenues.  The Hospital is a major employer and taxpayer in metropolitan Dallas.  The Hospital has over 315 employees and a medical staff of twenty psychiatrists and internal medicine practitioners.  CMS' actions would cause those employees to lose their jobs, adding financial and other stress to them and their families.  Additionally, both full and part time employees of Hospital purchase their healthcare from local providers, and the Hospital funds those services through facility-purchased health insurance plans.  These plans in many cases also cover employees' dependents.  Loss of their

jobs would also mean loss of this health insurance and decreased ability for these people and their families to pay for their healthcare.

65.     In 2014, the Hospital purchased over $4 million in services from the local community for its operations.  These services included the overall management and maintenance of the building and grounds, utilities, supplies for the hospital, and medical supplies for patients.  Last year, the Hospital paid over $1.84 million in property tax, state income tax, local and unemployment taxes.

66.     The Hospital has no adequate remedy at law, and seeks only to preserve the *status quo* pending the administrative hearing and any ultimate judicial review of the results of that administrative hearing.

67.     If injunctive relief is not granted, the Hospital will be forced to close.

### STATEMENT OF CLAIMS FOR RELIEF

### COUNT ONE

(Deprivation of Property and Liberty Without Due Process of Law)

68.     The allegations in the introduction and paragraphs 1 through 67 above are realleged and incorporated by reference herein.

69.     As applied to the Hospital and described above, Defendant's conduct and procedures deprive the Hospital of property and liberty interests without substantive and procedural due process of law.

70.     The Hospital has a liberty and/or property interest in its continued ability to carry on a lawful business; in its Medicare provider agreement; and in its institutional reputation.

71.    Accordingly, Defendant's actions and procedures, both on their face and as applied to the Hospital, violate the Due Process Clause of the Fifth Amendment to the United States Constitution and must be set aside upon ultimate judicial review pursuant to 5 U.S.C. § 706.

72.    The Hospital is entitled to an order enjoining Defendant from terminating the Hospital's participation in the Medicare program pending an administrative hearing.

## COUNT TWO

(Invalidity of Agency Action Under 5 U.S.C. § 706)

73.    The allegations in the introduction and paragraphs 1 through 72 above are realleged and incorporated by reference herein.

74.    Defendant's decision to terminate the Hospital's participation in the Medicare program is arbitrary, capricious, an abuse of discretion and otherwise not in accordance with the law in violation of 5 U.S.C. § 706.

75.    Defendant's termination of the Hospital's participation in the Medicare program without an administrative hearing on the matter is an abuse of discretion and would result in irreparable harm. Defendant's failure to restore Hospital's "deemed" status was an abuse of discretion and a violation of 42 C.F.R. § 488.7(e)(3).

76.    The Hospital is entitled to an order preventing Defendant from terminating the Hospital's participation in the Medicare program pending an administrative hearing.

## COUNT THREE

(Injunctive Relief Pending Agency Review under 5 U.S.C. 705)

77.    The allegations in the introduction and paragraphs 1 through 73 above are realleged and incorporated by reference herein.

78.    Pursuant to 5 U.S.C. § 705, this Court has the authority to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705.

79.    As explained above and in Plaintiff's Motion for Temporary Restraining Order, Preliminary Injunction and Request for Emergency Hearing, a Request for Expedited Review has been filed with the HHS Departmental Appeals Board. The Hospital's requested reconsideration of Defendant's erroneous termination of the Hospital from the Medicare program has not yet resolved.  The Hospital is entitled to an order restraining the termination of its participation in the Medicare program pending appeal, because it and the community would suffer irreparable injury should this action be allowed to proceed without hearing by the administrative appeals board.Prayer for relief


WHEREFORE, Plaintiff respectfully requests as relief in this action:

1)    that the Court temporarily restrain CMS from terminating the Hospital and set at the earliest possible time a hearing on a preliminary injunction pursuant to Federal Rules of Civil Procedure Rule 65;

2)    that the Court enter an injunction restraining CMS and the Secretary from terminating the Hospital's participation in the Medicare program to preserve the *status quo* pending the resolution of Plaintiff's administrative appeal rights and subsequent judicial review;

and

3)    that the Court award Plaintiff such other relief as the Court may deem just and proper.

Dated: <u>August 3, 2015</u>

Respectfully submitted,

<u>/s/ Victor D. Vital</u>
Victor D. Vital
<u>vitalv@gtlaw.com</u>
Texas Bar No. 0794798
Joseph P. Griffith
<u>griffithj@gtlaw.com</u>
Texas Bar No. 24045982

**Greenberg Traurig LLP**
2200 Ross Avenue, Suite 5200
Dallas, Texas 75201
Telephone:  (214) 665-3600
Facsimile:  (214) 665-3601


<u>/s/ Melissa M. Thompson</u>
Melissa M. Thompson
<u>lisa.thompson@leclairryan.com</u>
Massachusetts Bar No. 631893

**LeClairRyan PC**
One International Place, 11th Floor
Boston, Massachusetts 02110
Telephone:  617.502.8235
Facsimile:  617.502.5724
*Pro Hac Vice Admission Pending*


**Attorneys for Plaintiff**

## VERIFICATION PURSUANT TO 28 U.S.C. § 1746

I verify under penalty of perjury under the laws of the United States, that the foregoing is true and correct.

I further verify under penalty of perjury under the laws of the United States, that the Exhibits attached and incorporated herein are true and correct copies of the originals.


Shelah A. Adams
Chief Executive Officer

Executed on: 8/3/15